FILED
AUG 2 0 2014
[signature]
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| QUALITY WOOD DESIGNS, INC., | * | CIV 13-4101-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | CONCERNING MOTION |
| EX-FACTORY, INC. | * | TO DISMISS |
| and LASERCARE, INC., | * | |
| | * | |
| Defendants. | * | |

The motions to dismiss in this case present a difficult legal issue, as if a civil procedure professor and a Uniform Commercial Code professor conspired on a law school exam question, regarding whether some or all of the claims in this case arising out of the sale of a good must be litigated in North Carolina. The facts that relate to the legal issue framed are not in dispute, although other facts and circumstances certainly are.

## I.    Facts Pertinent to Motions to Dismiss

Plaintiff Quality Wood Designs, Inc. (Quality Wood) is a South Dakota corporation with its principal place of business in Mitchell, South Dakota. Doc. 1 at ¶ 1. Quality Wood specializes in the manufacture and sale of office and store fixtures, partitions, and shelving. Doc. 1 at ¶ 2.

Defendant Ex-Factory, Inc. (Ex-Factory) is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. Doc. 1 at ¶ 3; Doc. 34 at ¶ 1. Ex-Factory is an importer and dealer selling new and used machinery, including new and used woodworking machinery and industrial lasers, among other things. Doc. 1 at ¶ 4; Doc. 7 at ¶ 3; Doc. 34 at ¶ 3. Quality Wood and Ex-Factory had engaged in a few transactions prior to the one at issue between them in this case. Doc. 21.

Defendant Lasercare, Inc. (Lasercare) is incorporated outside the state of South Dakota and appears to have its principal place of business in South Carolina. Doc. 1 at ¶ 5. Lasercare provides maintenance, technical support, installation services, and reconditioning of industrial lasers, including reselling industrial lasers that have been refurbished or modified. Doc. 1 at ¶ 6; Doc. 7 at ¶¶ 7–8. Lasercare had been involved in a few transactions with Ex-Factory in the past, but had never dealt directly with Quality Wood before the transactions at issue here.

Quality Wood invokes diversity jurisdiction under 28 U.S.C. § 1332, because the parties have diversity of citizenship and because the amount in controversy exceeds $75,000. Doc. 1 at ¶ 7. Quality Wood has venued the case in the District of South Dakota, because Quality Wood is located here and a substantial portion of the conduct alleged in the Complaint occurred in South Dakota. Doc. 1 at ¶¶ 1, 8.

Quality Wood historically has paid an outside company to cut metal and aluminum used in its manufacturing of office fixtures, partitions, and shelving. Doc. 1 at ¶ 9. Quality Wood desired to purchase an industrial laser to do that work itself. Doc. 1 at ¶ 10. Quality Wood, through its operation manager Kelly Goldhammer, contacted Alan Schultz of Ex-Factory on or about October 16, 2011, to inquire about purchasing a used industrial laser. Doc. 1 at ¶ 11; Doc. 7 at ¶¶ 4–5; Doc. 11 at ¶¶ 2, 5. Quality Wood had no experience with industrial lasers, informed Ex-Factory of its inexperience with lasers, and described to Ex-Factory what Quality Wood needed such a laser to do. Doc. 11 at ¶¶ 7–9; Doc. 12 at ¶¶ 8–9. Discussions took place between Quality Wood's representative Goldhammer and Ex-Factory's representative Schultz in November of 2011 concerning the possible purchase of a TRUMPF L3030 CNC laser (the Laser), which was at the Lasercare facility in Clover, South Carolina. Doc. 7 at ¶¶ 5–6, 11–13;

2

Doc. 11 at ¶¶ 11–12. Ex-Factory separately communicated with Lasercare and its affiliated company Kazal L.L.C. (Kazal) about Ex-Factory purchasing that Laser.

On November 21, 2011, authorized representatives of Quality Wood and of Ex-Factory entered into an oral agreement under which Quality Wood would buy the Laser from Ex-Factory by paying Ex-Factory $249,000, plus $7,950 shipping. Doc. 7 at ¶ 14; Doc. 11 at ¶¶ 14–15; Doc. 12 at ¶¶ 12–13. The terms of the oral agreement between Quality Wood and Ex-Factory included a right for Quality Wood to rescind the agreement if it was not satisfied with the Laser after having viewed it in person. Doc. 11 at ¶ 15; Doc. 12 at ¶ 13. Ex-Factory did not issue a quote with any terms and conditions; Quality Wood did not issue a purchase order with any terms and conditions. The parties reached an oral agreement based on rather skeletal terms on November 21, 2011. Doc. 7 at ¶ 14; Doc. 11 at ¶¶ 14–15; Doc. 12 at ¶ 13. These terms were limited to identification of the type and capacity of the Laser, a price with shipping and payment terms, and the right of Quality Wood to rescind the agreement if it was not satisfied with the Laser upon viewing it. See Doc. 7 at ¶¶ 11, 14; Doc. 11 at ¶¶ 14–16; Doc. 12 at ¶¶ 12–13.

On November 22, 2011, Ex-Factory mailed to Mike Honermann, the president of Quality Wood, an invoice for the Laser. Doc. 7 at ¶¶ 15–16; Doc. 11 at ¶ 20; Doc. 12 at ¶¶ 17–18. The face of the invoice contained a "JURISDICTION & VENUE" provision stating:

> Jurisdiction & venue for actions arising out of this transaction shall be Mecklenburg County, North Carolina regardless of the Parties' place of business or the equipment's shipping point.

Doc. 7-1 at 5. The invoice also stated that the sale was subject to "Standard Terms & Conditions." Doc. 7-1 at 5. The accompanying "Terms & Conditions of Sale" stated in part: "The Parties irrevocably submit to the jurisdiction of the Mecklenburg County, North Carolina

3

[sic]¹ for the purpose of any suit, action, or other proceeding arising out of this Agreement."
Doc. 7-1 at 6. This Opinion and Order will refer to the consent-to-jurisdiction and venue-
selection language of this invoice and Terms & Conditions as "forum-selection terms." Ex-
Factory and Quality Wood had not discussed the forum-selection terms previously and did not
subsequently discuss these terms. Doc. 11 at ¶¶ 21–23; Doc. 12 at ¶¶ 20–21. Honermann
received but did not review or object to the invoice and attached Terms & Conditions of Sale.
Doc. 12 at ¶ 18. Quality Wood contests that forum-selection terms are part of the contract, so
its course of dealing with Ex-Factory and existence or non-existence of similar contract terms
becomes relevant.

Quality Wood and Ex-Factory had done some business together in the past. Doc. 21. In
a transaction in 2004, Quality Wood bought an edge bander from Ex-Factory. Doc. 21 at ¶ 7.
At that time Ex-Factory was not using the forum-selection terms in its invoice or Terms &
Conditions. See Doc. 21 at ¶ 9; Doc. 21-1. Quality Wood in 2009 sold the edge bander through
Ex-Factory, again without any forum-selection terms. Doc. 21 at ¶ 8; Doc. 21-2. In May of
2011, Quality Wood bought a DOUCET carrier from Ex-Factory and received the invoice and
Terms & Conditions of Sale in the same form and language as with the later purchase of the
Laser. Doc. 21 at ¶ 11; Doc. 21-4. After delivery of the DOUCET carrier, Quality Wood was
dissatisfied with the product and Ex-Factory took back the DOUCET carrier. Doc. 21 at ¶ 12.
In June of 2011, Quality Wood bought a clamp carrier from Ex-Factory and received the same
sort of invoice used for the Laser with terms and conditions containing the forum-selection terms

---

¹The words "state and federal courts" or "state court" or "courts" are missing. To the extent that
the absence of such words creates an ambiguity, that only would relate to whether the forum
selection is for both federal and state courts and not to the clear selection of the forum being North
Carolina courts with jurisdiction over Mecklenburg County.

choosing venue for any lawsuit in North Carolina. Doc. 21 at ¶¶ 15–17; Doc. 21-5. On none of the occasions did the parties discuss those forum-selection terms, did Quality Wood object to those terms, or did the parties litigate any matter. See Doc. 21.

On November 30, 2011, Honermann and Goldhammer visited Lasercare's facility in South Carolina and observed the Laser. Doc. 7 at ¶¶ 22–24; Doc. 11 at ¶¶ 24–28; Doc. 12 at ¶¶ 24–26. The Laser was not ready to cut aluminum or steel, the material Quality Wood desired to cut, because a resonator had not yet been installed on the Laser. Doc. 11 at ¶ 29; Doc. 12 at ¶ 28. According to Quality Wood's Complaint, representatives of both Ex-Factory and Lasercare negligently and fraudulently made promises and misrepresentations concerning the functioning of the Laser, which induced Quality Wood at that point not to rescind its oral purchase agreement and instead to proceed with the purchase of the Laser. Doc. 1 at ¶¶ 21–23; Doc. 11 at ¶¶ 29–31; Doc. 12 at ¶¶ 28–30. Quality Wood then made an initial payment of $124,000 to Ex-Factory toward purchase of the Laser. Doc. 11 at ¶¶ 24–28, 32; Doc. 12 at ¶¶ 24–26, 31.

Ex-Factory meanwhile had negotiated with Lasercare to buy the Laser. Ex-Factory issued a purchase order on November 22, 2011, at Lasercare's direction to Lasercare's affiliate, Kazal, to confirm purchase of the Laser. Doc. 34-3. Neither Lasercare nor Kazal had sent a quote attempting to dictate terms of the purchase and sale of the Laser to Ex-Factory. In the purchase order, Ex-Factory confirmed purchase of the Laser for $225,000 and included a provision that "SELLER and PURCHASER agree that jurisdiction and venue for any action arising out of this transaction shall be Mecklenburg County, North Carolina regardless of the Parties' place of business or the equipment's shipping point." Doc. 34-1. Lasercare's affiliate Kazal then responded with an invoice dictating no different terms and requiring payment of $112,500 as a deposit with the order and the remaining $112,500 prior to shipment. Doc. 34-4.

5

Ex-Factory had done previous business with Lasercare/Kazal.[2] Doc. 34 at ¶¶ 7–39. In one prior transaction, Lasercare/Kazal reviewed the language of an Ex-Factory purchase order that contained venue-selection and consent-to-jurisdiction clauses specifying North Carolina as the exclusive forum, objected to certain parts of the terms and conditions, and did not object to those forum-selection terms. Doc. 34 at ¶¶ 10–12; Doc. 34-2. Lasercare/Kazal did not object to the terms and conditions in the Ex-Factory purchase order for the Laser. Doc. 34 at ¶ 17; Doc. 34-5.

Goldhammer of Quality Wood later asked Ex-Factory for wiring instructions for the second and final payment for the Laser. Doc. 11 at ¶ 33; Doc. 12 at ¶ 32. On December 2, 2011, Schultz of Ex-Factory sent by email to Goldhammer wire transfer instructions to which Ex-Factory attached the invoice and Terms & Conditions of Sale containing the forum-selection terms. Doc. 7 at ¶ 18; Doc. 11 at ¶ 34; Doc. 12 at ¶¶ 33–34. Goldhammer personally had not received that material previously. Doc. 11 at ¶ 35. Quality Wood did not object to any language of the invoice or Terms & Conditions of Sale, and Goldhammer has no recollection of reviewing these documents. Doc. 11 at ¶¶ 35–39; Doc. 1 at ¶¶ 19–23.

Lasercare and Quality Wood entered into a separate installation agreement under which Lasercare assembled and configured the Laser at Quality Wood's business location in Mitchell, South Dakota. Doc. 1 at ¶¶ 24–26. The Complaint alleges that Lasercare encountered difficulties in getting the Laser operational in South Dakota and Quality Wood experienced numerous issues with the operation of the Laser at its facility. Doc. 1 at ¶¶ 27–34. According to the Complaint, on or about March 16, 2012, Lasercare refused to perform any additional

---

[2]Kazal is a limited liability company that appears to function as a division of Lasercare. The parties do not, for purposes of the briefing, draw a distinction between the entities, so this Opinion and Order refers to "Lasercare/Kazal" at times.

repairs on the Laser until Quality Wood entered into a services agreement with Lasercare, which Quality Wood then did because it felt forced to do so. Doc. 1 at ¶¶ 35–37. Quality Wood alleges that the Laser continued to malfunction thereafter. Doc. 1 at ¶¶ 38–39. Quality Wood later learned that the Laser's manufacturer would honor no warranty because of numerous modifications that Lasercare had made to the Laser of which Quality Wood allegedly was unaware at the time of its purchase. Doc. 1 at ¶¶ 38–48. Quality Wood alleges that the Laser turned out not to have the capacities to function as represented by Ex-Factory and Lasercare. Doc. 1 at ¶¶ 41–47; Doc. 11 at ¶¶ 43–46; Doc. 12 at ¶¶ 38–40. Lasercare's Complaint contains nineteen causes of action against Ex-Factory and Lasercare, some of which are contract based and others of which are tort based. Doc. 1.

## II.   Discussion

### A.   Choice of Law

This is a diversity jurisdiction case brought under 28 U.S.C. § 1332, where no party is challenging subject matter or personal jurisdiction of this Court. Rather, Ex-Factory is seeking dismissal, or in the alternative transfer of the case to the United States District Court for the Western District of North Carolina, based on what it contends to be valid forum-selection clauses in its contracts to buy the Laser from Lasercare and to sell the Laser to Quality Wood. A federal court in a diversity jurisdiction case ordinarily must follow the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); see also Cicle v. Chase Bank USA, 583 F.3d 549, 553 (8th Cir. 2009). When, however, there is a valid forum-selection clause and a diversity action is filed in a different forum, then the original venue's choice-of-law rules do not apply. Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex., 134 S. Ct. 568, 582–83 (2013).

In this case, the parties dispute whether there are valid forum-selection provisions. Thus, to determine whether the forum-selection provisions are enforceable, this Court initially would look to South Dakota choice-of-law rules. See Bell, Inc. v. IFS Indus., Inc., 742 F. Supp. 2d 1049, 1052 (D.S.D. 2010). Under South Dakota law, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." O'Neill Farms, Inc. v. Reinert, 780 N.W.2d 55, 59 (S.D. 2010) (quoting S.D. Codified Law (SDCL) § 53-1-4). "The test of the place of a contract is the place where the last act is done by either of the parties which is necessary to complete the contract and give it validity." Id. (quoting Briggs v. United Servs. Life Ins. Co., 117 N.W.2d 804, 807 (S.D. 1962)). The Supreme Court of South Dakota has recognized that parties may agree to be bound by the law of a particular state. See Butler Mach. Co. v. Morris Constr. Co., 682 N.W.2d 773, 776 (S.D. 2004) (citing Dunes Hospitality, LLC v. Country Kitchen Int'l, Inc., 623 N.W.2d 484, 488 (S.D. 2001)). However, South Dakota courts do not give effect to laws of other jurisdictions when those laws are contrary to the public policy of South Dakota. Bell, Inc., 742 F. Supp. 2d at 1052 (citing Butler Mach. Co., 682 N.W.2d at 776).

It is less than entirely clear where the "last act . . . done by either of the parties which is necessary to complete the contract and give it validity" occurred. O'Neill Farms, 780 N.W.2d at 59. As between Quality Wood and Ex-Factory, the last such act occurred in South Dakota or North Carolina or possibly in South Carolina when Quality Wood chose not to exercise its right to rescind and made the initial payment. As between Ex-Factory and Lasercare, the last such act occurred either in North Carolina or South Carolina. Ultimately, the choice of law makes little difference because the transaction between Quality Wood and Ex-Factory and the separate

8

transaction between Ex-Factory and Lasercare involve a sale of a good governed by Article 2 of the Uniform Commercial Code (UCC). South Dakota, North Carolina, and South Carolina all have adopted the UCC, and there appears to be no material difference in the law among the three states as concerns the UCC. Compare U.C.C. Part 2 (1977), with N.C. Gen. Stat. Ann. Ch. 25 Art. 2 (2014), SDCL Ch. 57A–2 (2014), and S.C. Code Ann. Title 36 Ch. 2 (2013).[3]

**B.      Application of the UCC to the Transactions at Issue**

**1. UCC § 2-207 - Additional Terms in Acceptance of Confirmation**

UCC section 2-207 applies to situations where a party seeks to introduce additional contract terms in its acceptance or confirmation such as Ex-Factory did in its invoice to Quality Wood and its purchase order to Lasercare. UCC section 2-207 provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>> (a) the offer expressly limits acceptance to the terms of the offer;
>> (b) they materially alter it; or
>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those

---

[3]With regard to the specific provisions of the UCC at issue, section 2-207 and section 2-104, there is no difference in the statutes in South Dakota, North Carolina, and South Carolina. None of the three states has controlling case law on the legal issues on application of section 2-207 and section 2-104 to a dispute of this nature.

>           terms on which the writings of the parties agree, together with any
>           supplementary terms incorporated under any other provisions of
>           this Act.

U.C.C. § 2-207; see also N.C. Gen. Stat. Ann. § 25-2-207; SDCL § 57A-2-207; S.C. Code Ann.
§ 36-2-207.[4] As applied to the transactions at issue in this case, sections 2-207(1) and 2-207(3)
make clear that, even though the parties may disagree over certain terms, a contract existed
between Quality Wood and Ex-Factory and a separate contract existed between Ex-Factory and
Lasercare/Kazal regarding the Laser.

The heart of the issue here concerns application of section 2-207(2). Section 2-207(2)
applies to two situations: (1) where parties to an agreement involving a good send to each other
terms and conditions containing varying language, which creates the so-called "battle of the
forms;" and (2) where an agreement involving a good has been reached and one side sends a
confirmation that sets forth terms not discussed or explicitly agreed upon. U.C.C. § 2-207(2)
cmt. 1. This latter situation applies to both transactions at issue. An oral agreement formed
between Quality Wood and Ex-Factory on November 21, prior to the two occasions when Ex-
Factory sent the invoice and Terms & Conditions of Sale containing the forum-selection terms.
Similarly, in the transaction between Ex-Factory and Lasercare/Kazal, Ex-Factory sent the
purchase order to confirm an oral agreement reached for Lasercare/Kazal to sell and Ex-Factory
to buy the Laser. Doc. 34-3.

Under section 2-207(2), such additional terms—like those contained in the invoices that
Ex-Factory sent to Quality Wood and those contained in the purchase order that Ex-Factory sent
to Lasercare/Kazal—are considered to be "proposals for addition to the contract." U.C.C. § 2-

---

[4]Because South Dakota, North Carolina, and South Carolina have adopted UCC § 2-207, this
Opinion and Order will often cite UCC section 2-207 only when discussing section 2-207.

207(2).  "Between merchants such terms become part of the contract unless" certain conditions

exist.  Id.  If the transaction involves a non-merchant, then the additional terms do not become

part of the contract unless the non-merchant consents to those terms.  See, e.g., Klocek v.

Gateway, Inc., 104 F. Supp. 2d 1332, 1341 (D. Kan. 2000) (applying UCC section 2-207 as

identically enacted under Kansas law); McCaulley v. Neb. Furniture Mart, Inc., 838 N.W.2d 38,

46 (Neb. Ct. App. 2013) (interpreting UCC section 2-207 as identically enacted under Nebraska

law); 1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code

§ 2:19 (2012 & Supp. 2013–14).

### 2. Whether Quality Wood is a Merchant

Quality Wood argues that it is not a merchant for purposes of its acquisition of the Laser

from Ex-Factory. Doc. 10 at 10–15. Quality Wood concedes that it is a merchant when selling

office and store fixtures, partitions and shelving, because that is its business. However, Quality

Wood maintains that its unfamiliarity with the particular product involved, an industrial laser that

it had never purchased before, means that it is not a merchant in this particular transaction. Doc.

10 at 10–15.

Section 2-207(2) uses the phrase "between merchants" in defining the situation where

such terms may become part of a contract.  UCC section 2-104(3) states:

> "Between merchants" means in any transaction with respect to
> which both the parties are chargeable with the knowledge or skill
> of merchants.

U.C.C. § 2-104(3); see also N.C. Gen. Stat. Ann. § 25-2-104(3); SDCL § 57A-2-104(3); S.C.

Code Ann. § 36-2-104(3).[5]  In turn "between merchants" is to be interpreted as requiring that

---

[5]Because South Dakota, North Carolina, and South Carolina have adopted UCC section 2-104, this Opinion and Order will often cite UCC section 2-104 only when discussing section 2-104.

11

each of the parties involved qualify as a "merchant" under UCC § 2-104(1).  2 David Frisch,

Lawrence's Anderson on the Uniform Commercial Code § 2-104:9 (3d. ed. 2014) (hereinafter

"Lawrence's Anderson on the UCC").

In turn, UCC § 2-104(1) defines "merchant" as follows:

> "Merchant" means a person who deals in goods of the kind or
> otherwise by his occupation holds himself out as having
> knowledge or skill peculiar to the practices or goods involved in
> the transaction . . . .

U.C.C. § 2-104(1); see also N.C. Gen. Stat. § 25-2-104(1); SDCL § 57A-2-104(1); S.C. Code

Ann. § 36-2-104(1).  By its terms, UCC section 2-104(1) applies not only to an entity that "deals

in the goods of the kind," such as Ex-Factory and Lasercare with regard to the Laser, but also to

those who "otherwise by his occupation holds himself out as having knowledge or skill peculiar

to the practices or goods involved in the transaction."  There is no question that the transaction

by which Lasercare/Kazal sold the Laser to Ex-Factory is a transaction "between merchants."

The question remains whether Quality Wood is a "merchant" under UCC section 2-104(1) when

buying the Laser.

The language of UCC section 2-104 is in the disjunctive deeming an entity to be a

merchant if it "holds [itself] out as having knowledge *or* skill peculiar to the practices *or* goods

involved in the transaction."  U.C.C. § 2-104(1) (emphasis added).  Quality Wood's argument

that it was not a merchant when buying the Laser essentially reads UCC section 2-104 in the

conjunctive, rather than in the disjunctive as it is written.  As Official Comment 2 to UCC

section 2-104 makes clear,[6] the status as a merchant "may be based upon specialized knowledge

---

[6]Many courts have observed that the Official Comments to the UCC, while not binding, are useful and persuasive in interpreting the UCC.  See, e.g., In re Dale, 582 F.3d 568, 574 (5th Cir. 2009); McCarthy v. BMW Bank of N. Am., 509 F.3d 528, 530 n.3 (D.C. Cir. 2007); JOM, Inc. v.

12

as to the goods, specialized knowledge as to business practices, or specialized knowledge as to

both." U.C.C. § 2-104 cmt. 2. Comment 2 also observes that the special provisions applying to

merchants appear in only certain sections, including UCC section 2-207, and that "[f]or purposes

of these sections almost every person in business would, therefore, be deemed to be a 'merchant'

under the language 'who . . . by his occupation holds himself out as having knowledge or skill

peculiar to the practices . . . involved in the transaction . . . .'" Id. (quoting U.C.C. § 2-104(1)).

The rationale cited by Comment 2 is that practices covered by such sections as section 2-207

where there is either a battle of the forms or terms sent after a contract is reached are "non-

specialized business practices," that is, business practices that occur generally between merchants

trying to dictate favorable terms, and not unique practices to the sale of a particular good like a

laser. Id. Even though Quality Wood did not have knowledge or skill peculiar to this Laser, it

did have "knowledge or skill peculiar to the practices . . . involved in the transaction." U.C.C.

§ 2-104(1).[7] Quality Wood had engaged in transactions with Ex-Factory in the past to purchase

other equipment and was in the business of transacting in goods itself through its sale of office

---

Adell Plastics, Inc., 193 F.3d 47, 57 n.6 (1st Cir. 1999). The UCC is designed to be uniform after
all, state legislatures in many states have adopted the UCC without any alteration, businesses rely
on the consistent application of UCC provisions in conducting their affairs, and thus courts ought
to strive to maintain a consistent interpretation of UCC provisions. Reference to the Official
Comments helps in such an endeavor.

[7]Official Comment 3 to UCC 2-104 likewise supports a definition of "merchant" to include
sophisticated business, by stating:

> The "or to whom such knowledge or skill may be attributed by his employment of
> an agent or broker . . ." clause of the definition of merchant means that even persons
> such as universities, for example, can come within the definition of merchant **if
> they have** regular purchasing departments or **business personnel who are familiar
> with business practices and who are equipped to take any action required.**

U.C.C. § 2-104 cmt. 3 (emphasis added).

13

and store fixtures, partitions, and shelving. Quality Wood was a "merchant" in purchasing the laser from Ex-Factory.

Quality Wood cites to Minnesota Forest Products, Inc. v. Ligna Machinery, Inc., 17 F. Supp. 2d 892 (D. Minn. 1998), where the court determined that an entity "may be considered a merchant only if it possessed specialized knowledge or skill peculiar to the sawmill equipment that it bought." Id. at 905 (emphasis removed). That conclusion in Minnesota Forest is contrary to the language of UCC section 2-104(1), and indeed contrary to the statute that the court was to apply, Chapter 336, section 2-104 of the Minnesota Statutes. The only case that Minnesota Forest cited in its reasoning on the point—Regents of the University of Minnesota v. Chief Industries, Inc., 106 F.3d 1409 (8th Cir. 1997)—actually concluded that the University of Minnesota was a "merchant" in its purchase of a grain dryer and thus does not stand for the proposition that an entity must have specialized knowledge in the particular good involved in order to be considered a merchant, only that such knowledge is sufficient to be classified as a merchant. Id. at 1411–12. The Minnesota Forest restrictive reading of "merchant" is at odds not only with the language of UCC section 2-104(1), but also with cases that find entities to be merchants based on familiarity with business practices. See, e.g., K & M Joint Venture v. Smith Int'l, Inc., 669 F.2d 1106, 1115 (6th Cir. 1982) (holding that experienced contractor familiar with business practices is merchant with respect to buying certain equipment despite lack of special knowledge of that equipment); Columbus Trade Exch., Inc. v. AMCA Int'l Corp., 763 F. Supp. 946, 955 n.14 (S.D. Ohio 1991) (observing that the UCC makes distinctions between "the casual or inexperienced buyer and seller and the interaction 'between merchants'" and that UCC section 2-207 requires the higher standard of conduct "applied to a merchant based upon their presumed higher degree of familiarity with typical business practices"). The weight of authority supports a much broader definition of "merchant" in section 2-207 than employed in Minnesota Forest. See Lawrence's Anderson on the UCC § 2-207:148; see

14

also Providence & Worcester R. Co. v. Sargent & Greenleaf, Inc., 802 F. Supp. 680, 684 n.2 (D.R.I. 1992) (noting that the Rhode Island version of 2-207 "calls for an expansive definition of 'merchant'"); Keywell, L.L.C. v. Perkinelmer, Inc., No. 11-CV-182-HKS, 2013 WL 450017, at *5 (W.D.N.Y. Aug. 26, 2013) (observing that the state courts in New York have a "liberal application" of UCC section 2-104 and explaining the reasons therefor).

### 3. Whether the Forum-Selection Clauses "Materially Alter" the Contracts.

Because all parties to this action were merchants for purposes of the purchase and sale of the Laser, additional terms contained in the invoice that Ex-Factory sent to Quality Wood and separately in the purchase order that Ex-Factory issued to Lasercare become part of the contract under UCC section 2-207 unless:

> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

U.C.C. § 2-207(2); see also N.C. Gen. Stat. Ann. § 25-2-207(2); SDCL § 57A-2-207(2); S.C. Code Ann. § 36-2-207(2). Neither Quality Wood nor Lasercare, in dealing with Ex-Factory regarding the Laser, made an offer that was expressly limited to the terms of the offer, and neither Quality Wood nor Lasercare objected to the forum-selection provision previously or within a reasonable time after receiving Ex-Factory's forum-selection provisions. Thus, the question becomes whether the challenged term—purporting to make jurisdiction and venue exclusive in Mecklenburg County, North Carolina—"materially alters" the oral contracts by which Ex-Factory bought and then sold the Laser. If those terms materially alter the original bargains, they do not become part of the contract. U.C.C. § 2-207(2) cmt. 3.

15

Official Comment 4 to UCC section 2-207 explains that typical clauses constituting material alterations of the contract are ones that "result in surprise or hardship if incorporated without express awareness by the other party." Official Comments 4 and 5 to UCC section 2-207 then provide illustrations of clauses that materially alter the contract and those that do not. A forum-selection clause is not one of the illustrations provided in Official Comments 4 and 5. Under Official Comment 4, typical clauses that result in surprise or hardship and thereby materially alter the contract are:

> a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances which either warranty normally attaches; a clause requiring a guarantee of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

U.C.C. § 2-207 cmt. 4. In turn, examples of clauses that do not involve such an element of unreasonable surprise and thereby are deemed incorporated in contracts between merchants absent some objection include:

> a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions or a clause fixing in advance any reasonable formula of proration under such circumstances; a clause fixing a reasonable time for complaints within customary limits, or in the case of a purchase for subsale, providing for inspection by the sub-purchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner . . . .

16

U.C.C. § 2-207 cmt. 5. None of these illustrations in Official Comments 4 and 5 provide much guidance concerning which category forum-selection clauses would fit. The Official Comments provide a suggestion that terms departing from standard practices or usage in trade normally would materially alter the contract, and that those terms within the range of trade practice or deviating little from such trade practices usually would not materially alter the contract.

Perhaps not surprisingly, given the absence of a clear answer from the Official Comments, courts have divided on whether forum-selection provisions constitute a material alteration of a contract under UCC section 2-207(2)(b). There are a number of decisions that have concluded that forum-selection provisions materially alter a contract, such that they do not become incorporated under UCC section 2-207(2)(b). See Belanger, Inc. v. Car Wash Consultants, Inc., 452 F. Supp. 2d 761, 765–66 (E.D. Mich. 2006); M.K.C. Equip. Co., Inc. v. M.A.I.L. Code, Inc., 843 F. Supp. 679, 686 (D. Kan. 1994); Dale R. Horning Co., Inc. v. Falconer Glass Indus., Inc., 710 F. Supp. 693, 698–99 (S.D. Ind. 1989); Office Supply Store.com v. Kansas City Sch. Bd., 334 S.W.3d 574, 580 (Mo. App. 2011).

Particularly when there is a course of dealing between merchants where forum-selection provisions have been repeatedly sent to a party, other courts, including the United States Court of Appeals for the Eighth Circuit and district courts therein, have concluded that forum-selection clauses in fact become part of a contract between merchants. See Nordyne, Inc. v. Int'l Controls & Measurements Corp., 262 F.3d 843, 847 (8th Cir. 2001) (deeming forum-selection provision to be part of the parties' course of dealing and incorporated by reference when the parties had a ten-year relationship); Bell, Inc., 742 F. Supp. 2d at 1053–54; CFMoto Powersports, Inc. v. NNR Global Logistics USA, Inc., No. 09-2202 (JRT/JJK), 2009 WL 4730330, at *4–5 (D. Minn. Dec. 4, 2009); Highland Supply Corp. v. Kurt Weiss Greenhouses, Inc., No. 08-859-GPM, 2009 WL

17

2365244, at *2 (S.D. Ill. April 28, 2009); TSR Silicon Res., Inc. v. Broadway Com Corp., No. 06 Civ. 9419 (NRB), 2007 WL 4457770, at *4 (S.D.N.Y. Dec. 14, 2007). As a result, the comments and cases suggest that the answer to the question whether a forum-selection provision materially alters a contract under UCC section 2-207 is that it depends.[8]

In some instances, courts have considered the question of material alteration to be one for the jury, including the most recent case involving UCC section 2-207 from the Eighth Circuit. See BVS, Inc. v. CDW Direct, LLC, No. 13-1766, 2014 WL 3511778, at *3-4 (8th Cir. July 17, 2014) (holding that question of fact for the jury exists on whether warranty disclaimers materially altered the agreement and whether the course of dealing supplemented the agreement). A court, however, cannot submit to the jury the question of where a case ought to be venued. Moreover, there is no genuine issue of material fact for trial in this case regarding any issue impacting the application of UCC section 2-207(2), although the parties have disputes of fact on the merits of the claims in the complaint.

Because UCC section 2-207(2) presumes that between merchants additional terms will be included in the contract absent seasonable objection to those terms, the burden of proving the materiality of the alteration appears to fall on the party that opposes inclusion. See Aceros Prefabricados 282 F.3d at 100 (citing Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G., 215

_____

[8]Perhaps the most analogous provision to forum-selection clauses in contracts involving sales of goods is an arbitration clause. There is a similar divide in authority over whether arbitration clauses "materially alter" the contract such that they do not become incorporated under UCC section 2-207(2)(b) in a contract between merchants where no seasonable objection is made. Compare Aceros Prefabricados, S.A. v. TradeArbed, Inc., 282 F.3d 92, 100–02 (2nd Cir. 2002) (arbitration clause does not materially alter contract and is incorporated under section 2-207(2)), with Coastal Indus., Inc. v. Automatic Steam Prods. Corp., 654 F.2d 375, 379 (5th Cir. 1981) (arbitration clause constitutes a material alteration and does not become incorporated under 2-207(2)).

18

F.3d 219, 223 (2nd Cir. 2000)). A material alteration, again, is one that would result in surprise or hardship if incorporated without express awareness of the other party. U.C.C. § 2-207 cmt. 4. "Surprise includes both a subjective element of what a party knew and an objective element of what a party should have known."[9] Aceros Prefabricados, 282 F.3d at 100.

In evaluating surprise or hardship, it is natural to look first at the course of dealing[10] between the merchants to determine whether the clause had been part of previous transactions between the parties. Indeed, the use in previous transactions of forum-selection clauses have prompted several courts to determine that a forum-selection clause had become part of a course of dealing and in turn part of the contract at issue. See Nordyne, Inc., 262 F.3d at 846–47; Bell, Inc., 742 F. Supp. 2d at 1053–54; CFMoto Powersports, 2009 WL 4730330, at *4–5. If a plaintiff has agreed to the same forum-selection provision in the course of other similar transactions with the same defendant, that plaintiff has little claim to surprise or hardship.

---

[9]There are two matters relating to UCC section 2-207 on which this Court respectfully departs from portions of decisions in the United States Court of Appeals for the Second Circuit. First, the Second Circuit has stated that the party opposing inclusion of the term "must establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term." Bayway Ref., 215 F.3d at 224. Such a burden is not derived from the language of UCC section 2-207(2) or the comments thereto, and thus is beyond what is required to show "surprise or hardship." Second, the Second Circuit has suggested that surprise might be equated with hardship. See Aceros Prefabricados, 282 F.3d at 101 (observing that the court previously "noted that while Official Comment 4 to section 2-207 seems to suggest that hardship is an independent ground for finding that an alteration is material, there are cases indicating that hardship is not an element separate from surprise but rather a 'consequence' of material alteration"). However, Official Comment 4 to UCC section 2-207 makes clear that material alterations are ones that "result in surprise _or_ hardship if incorporated without express awareness by the other party." U.C.C. § 2-207 cmt. 4 (emphasis added). Surprise and hardship appear to be two separate considerations under Official Comment 4 to UCC section 2-207(2).

[10]"Trade usage and the course of dealing are always relevant to determine the content of an oral agreement in the first place." 1 White, Summers, & Hillman, supra § 2:15 at 109.

The course of dealing between Ex-Factory and Lasercare/Kazal indicates that Lasercare would not be surprised by inclusion of a forum-selection provision. In a previous transaction involving other equipment, Lasercare/Kazal reviewed Ex-Factory's terms and conditions, objected to parts of those terms and conditions, but did not object to the forum-selection provisions. Doc. 34 at ¶¶ 10–12; Doc. 34-2.

The prior transactions between Ex-Factory and Quality Wood, however, do not establish that forum-selection clauses had become part of their course of dealing. Quality Wood and Ex-Factory had engaged in transactions in 2004 and 2009, with no documents setting forth forum-selection provisions. Doc. 21 at ¶¶ 8–9; Doc. 21-1; Doc. 21-2. In two transactions in 2011, one of which was canceled after delivery of the product, Ex-Factory included the forum-selection terms in its invoice and accompanying Terms & Conditions of Sale. Doc. 21 at ¶¶ 11–12, 15–17; Doc. 21-4; Doc. 21-5. However, the parties did not discuss those terms, Quality Wood did not respond in a way to suggest that it had reviewed and agreed with the clause, and there was no litigation commenced by either party. See Doc. 21. This history of transactions between Quality Wood and Ex-Factory differs from those cases where a course of dealing alone established that forum-selection provisions were incorporated into the contract at issue. See Nordyne, 262 F.3d at 844–47 (deeming forum-selection provision to be part of the parties' course of dealing and incorporated by reference when the parties had a ten-year relationship); Bell, 742 F. Supp. 2d at 1053–54 (relying upon the parties' course of dealing for eight years in determining that forum-selection provisions contained in invoices had become part of the course of dealing); CF Moto Powersports, 2009 WL 4730330, at *4 (relying on Nordyne to incorporate forum-selection provision under section 2-207 when forum-selection clause had been included on the back of 224 invoices sent over a fifteen-month period); TSR Silicon Res., 2007 WL 4457770, at *4 (finding forum-selection provision in invoice not to be a material alteration when no less than seventy-five invoices containing the forum-

20

selection provision had been sent over a five-year period). Nevertheless, the inclusion by Ex-Factory of forum-selection terms in invoices and Terms & Conditions of Sale sent to Quality Wood in the two transactions closest in time tends to undercut Quality Wood's argument of "surprise," notwithstanding that it is not a sufficient course of dealing, standing alone, for this Court to conclude that the forum-selection terms had thereby become part of the transaction for the Laser at issue.

The course of dealing, though an important consideration, is just one fact in deciding whether there is "surprise." Other factors in evaluating "surprise" under Official Comment 4 to UCC section 2-207(2) should include when in the transaction the proposed term was sent, how in the transaction the proposed term was sent, to whom the term was sent, and whether the term is somehow unusual. See Am. Ins. Co. v. El Paso Pipe & Supply Co., 978 F. 2d 1185, 1191 (10th Cir. 1992) (identifying course of dealing, industry custom, conspicuousness of the challenged term, and a party's own standard terms as relevant factors considered by other courts for determining unreasonable surprise); Rocheux Int'l of N.J., Inc. v. US Merchs. Fin. Grp., Inc., 741 F. Supp. 2d 651, 682 (2010) (considering "(1) the parties' prior course of dealing; (2) industry custom; (3) how clearly the additional terms were marked in the confirmation; and (4) whether the additional terms appeared in the parties' standard forms" to determine whether an additional term caused an "unreasonable surprise"). For example, "surprise" through a material alteration would exist when a seller sends an invoice containing a forum-selection provision to the merchant buyer long after the performance of the contract, buried in nearly illegible print with confusing terms sent only to the buyer's accounts payable clerk, and choosing a venue that would be peculiar to the transaction.[11]

---

[11]A peculiar venue may be where Delaware, being the seller's state of incorporation, is chosen as the venue when the seller is doing business from North Carolina with a South Dakota buyer and no part of the transaction involves Delaware.

See, e.g., Belanger, Inc., 452 F. Supp. 2d at 766 (involving invoice sent after the completed sale). By contrast, the argument of "surprise or hardship" is diminished in a situation where the seller sends an invoice the day after an agreement is reached to the buying merchant's president or general manager during a time when the merchant buyer has an opportunity to cancel the agreement and containing little additional information than the price and a conspicuous venue selection clause choosing the venue of the seller's home state.

Ex-Factory sent the invoice and Terms & Conditions of Sale on November 22, 2011, to the president of Quality Wood on the day after the oral agreement was reached for Quality Wood to buy the Laser from Ex-Factory. Doc. 7 at ¶¶ 14–16; Doc. 11 at ¶¶ 14–15, 20; Doc. 12 at ¶¶ 17–18. The face of the invoice contained a heading "JURISDICTION & VENUE" that specified that jurisdiction for actions arising out of the transaction shall be Mecklenburg County, North Carolina. Doc. 7-1 at 5. The face of the invoice also referenced terms and conditions, which were sent with the invoice. The Terms & Conditions of Sale are one page long and have a section entitled "**VENUE**" under which a similar provision for consent to jurisdiction and venue in Mecklenburg County, North Carolina appears. Doc. 7-1 at 6. At the time Ex-Factory initially sent that invoice and Terms & Conditions of Sale on November 22, 2011, Quality Wood had not performed any part of its side of the transaction. Indeed, Quality Wood retained a right to rescind the agreement if it was dissatisfied with the performance of the Laser upon its viewing of the Laser at Lasercare's facility. Doc. 11 at ¶ 15; Doc. 12 at ¶ 13. Quality Wood viewed the Laser on November 30, 2011, chose not to rescind the contract, and made a partial payment for the Laser on that date. Doc. 7 at ¶¶ 22–24; Doc. 11 at ¶¶ 24–28, 32; Doc. 12 at ¶¶ 24–26, 31. Ex-Factory again sent the same invoice and Terms & Conditions of Sale, this time to the operations manager of Quality Wood, on December 2, 2011. Doc. 7 at ¶ 18; Doc. 11 at ¶ 34; Doc. 12 at ¶¶ 33–34. Thereafter, Quality Wood completed its performance on the transaction with Ex-Factory by making the final payment.

22

Quality Wood did not object to the invoice or the attached Terms & Conditions of Sale. Under the unique circumstances of this situation, Quality Wood ought not to have been surprised by the venue selection provision, and its surprise, if any, would result from both its President and its Operation Manager having failed to review plain language on the face of the invoice and a single page of terms and conditions with regard to a major equipment purchase for its business.

Similarly, with regard to the transaction between Ex-Factory and Lasercare/Kazal, Ex-Factory issued the purchase order on November 22, 2011, to confirm its purchase of the Laser from Lasercare/Kazal. Doc. 34-3. This apparently was the same day on which Ex-Factory and Lasercare reached agreement on sale of the Laser to Ex-Factory. Lasercare/Kazal had not performed the transaction, had not delivered the Laser, and received terms and conditions within the purchase order which it had seen before. See Doc. 34-1; Doc. 34-3. Lasercare/Kazal previously had objected to certain terms and conditions of a purchase order from Ex-Factory without objecting to the consent-to-jurisdiction and venue-selection provisions, so Lasercare/Kazal has little reason to assert surprise at inclusion of those terms in its transaction to sell the Laser to Ex-Factory. Ultimately, the burden of proving surprise or hardship rests with the merchant who is objecting to the inclusion of that term, because UCC section 2-207(2) presumes that between merchants such terms get incorporated absent seasonable objection. Aceros Prefabricados, 282 F.3d at 100 (citing Bayway Ref., 215 F.3d at 223). Neither Quality Wood nor Lasercare can show surprise.

As for hardship, Quality Wood points to the difficulty of litigating in North Carolina when more witnesses and evidence are located in South Dakota. Ex-Factory naturally counters by arguing that it is a hardship to Ex-Factory to litigate in South Dakota when its witnesses and documents are in North Carolina and it expected its forum-selection clauses to be enforceable. The "hardship" referenced in Official Comment 4 to UCC section 2-207(2) ought to be something other than a debate over the advantage of one's home forum or convenience of litigating in one's home

23

state. Quality Wood could foresee that any contract dispute between it and Ex-Factory would be litigated in either South Dakota or North Carolina; the prospect of litigation in North Carolina as opposed to South Dakota is not a sufficient "hardship" to negate the effect of UCC section 2-207(2).

Lasercare has a better argument for hardship. Lasercare has no argument for changing the venue of Quality Wood's claims against it from South Dakota. The service agreement between Lasercare and Quality Wood did not have a venue-selection provision, and Lasercare is subject to jurisdiction here on the claims made by Quality Wood. Thus, Lasercare points to the potential hardship, if Ex-Factory's forum-selection clauses apply and are enforced, of being the lone defendant in South Dakota when the alleged conduct of Ex-Factory merits its inclusion to indemnify or share responsibility, if any, with Lasercare. Lasercare also foresees the possibility of defending the case on two fronts—this case in South Dakota and potentially as a third-party defendant in North Carolina if Quality Wood's case against Ex-Factory is transferred or refiled there. However, Lasercare's argument presupposes that enforcing the forum-selection clauses would result in Ex-Factory no longer being a party in this lawsuit. That is not necessarily the case for reasons explained below.

### C.    Effect of Venue-Selection Provision on Claims

#### 1. Plaintiff's Complaint

The forum-selection terms in Ex-Factory's invoice to Quality Wood stated that "[j]urisdiction & venue for actions arising out of this transaction shall be Mecklenburg County, North Carolina . . . ." Doc. 7-1 at 5. The Terms & Conditions of Sales, while less than altogether clear in its construction, contain a provision where the parties "irrevocably submit to the jurisdiction of the Mecklenburg County, North Carolina [sic] for the purpose of any suit, action, or other proceeding arising out of this Agreement." Doc. 7-1 at 6. Quality Wood's Complaint states claims

24

against Ex-Factory for breach of contract, breach of implied warranty of merchantability, breach of warranty of fitness for a particular purpose, breach of express warranty, breach of implied warranty of good faith and fair dealing, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, negligence, and rescission against Ex-Factory. Doc. 1. All of those claims are "arising out" of the transaction by which Quality Wood bought the Laser from Ex-Factory and none of those claims involve conduct by Ex-Factory following its receipt of the second payment for the Laser, other than not allowing rescission of the contract by Quality Wood. That is, none of the alleged breaches of contracts or torts perpetrated by Ex-Factory occurred apart from or after performance of the contract. Thus, all of Quality Wood's claims in the Complaint against Ex-Factory are "arising out of this transaction" involving its purchase of the Laser from Ex-Factory. Doc. 7-1 at 5; see also Doc. 7-1 at 6. To sue Ex-Factory on such claims, given the effect of UCC section 2-207(2), Quality Wood would need to venue the action in North Carolina.

The Supreme Court of the United States recently addressed the "appropriate way to enforce a forum-selection clause." Atl. Marine, 134 S. Ct. at 580. Under Atlantic Marine, forum-selection clauses are to be enforced through the doctrine of forum non conveniens, under which a district court generally should transfer, rather than dismiss, the case. Id. at 579–80. The Supreme Court in Atlantic Marine, however, did not have before it a case like this one, where the plaintiff has sued a second defendant and that second defendant has filed, through a cross-claim, claims for indemnification and contribution against the defendant who has the benefit of a forum-selection clause. So this Court is presented again with a somewhat novel issue.

### 2. Effect on Lasercare's Cross-Claim

Ex-Factory and Lasercare/Kazal have an agreement over the sale of the Laser to Ex-Factory that selects Mecklenburg County, North Carolina, as the jurisdiction and venue for any dispute

25

"arising out of this transaction." Doc. 34-1. The transaction between Ex-Factory and Lasercare/Kazal was the separate sale of the Laser to Ex-Factory. Ex-Factory entered into a separate and second transaction by which it sold the Laser to Quality Wood. That is, there were two transactions involved, with different pricing and terms, albeit for the same Laser. The provision in the purchase order issued by Ex-Factory to Lasercare did not say that North Carolina would be the exclusive jurisdiction and venue for any action arising out of this transaction *and* any subsequent resale or issue involving resale and performance of the Laser regardless of who brings the claims. Likewise, the forum-selection provision did not state that Lasercare must bring any and all claims against Ex-Factory in North Carolina, regardless of whether those claims relate to this transaction or to any subsequent resale or performance issue of any nature concerning the Laser. Ex-Factory wants to read the provision in such a manner, but this Court must give the language its plain meaning and of course must construe ambiguities against the drafter—Ex-Factory—because it is the drafter who had the opportunity to make the language clear. See LLC v. Se. Prop. Ltd., 787 N.W.2d 778, 785 (S.D. 2010); Chavis v. S. Life Ins. Co, 347 S.E.2d 425, 427 (N.C. 1986). Thus, the forum-selection provision in the purchase order issued by Ex-Factory to Lasercare is not an impediment to Lasercare bringing claims against Ex-Factory that arise out of something other than the transaction by which Lasercare sold the Laser to Ex-Factory.

Quality Wood's Complaint has claims for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and negligence. Doc. 1. Those claims relate to alleged misrepresentations made by Lasercare and Ex-Factory during the November 30, 2011 visit to South Carolina by Quality Wood representatives to view the Laser. The transaction by which Ex-Factory purchased the Laser from Lasercare/Kazal occurred on or just before November 22, 2011, which is the date on which Ex-Factory confirmed the purchase, although performance was completed after that date. The misrepresentations allegedly made to

Quality Wood are distinct from claims "arising out of this transaction" between Ex-Factory and Lasercare. Doc. 34-1. Indeed, Quality Wood, as a non-party to the transaction between Ex-Factory and Lasercare/Kazal, has no claims arising out of that transaction. Rather, Quality Wood's claims about alleged misrepresentations arise in tort. Likewise, Lasercare's claims for contribution and indemnity from Ex-Factory on such claims do not arise out of the transaction by which Ex-Factory bought the Laser from Lasercare/Kazal; Lasercare's claims are not contractual claims for contribution and indemnity but seek to foist responsibility on Ex-Factory as an alleged joint tortfeasor.

Therefore, the forum-selection provisions in the purchase order do not prevent Lasercare, as a defendant in this action, from asserting claims in this action for indemnification and contribution against Ex-Factory. Lasercare has done that through a cross claim because Ex-Factory presently is a co-defendant. If Ex-Factory no longer is a co-defendant, the proper vehicle for Lasercare to bring such claims would be a third-party complaint. Fed. R. Civ. P. 14.

### 3. Public Interest Consideration and Hardship

Two final issues remain under Atlantic Marine—whether this might be "the most unusual" case where a valid forum-selection clause should not be enforced, and, if not, whether this Court should transfer or dismiss the Complaint. Atl. Marine, 134 S. Ct. at 583. In Atlantic Marine, the Supreme Court noted that when a valid forum-selection clause exists, the calculus favoring a plaintiff's choice of forum changes. Id. at 581. The Supreme Court noted that there are three effects: (1) "the plaintiff's choice of forum merits no weight;" (2) "a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider argument about the parties' private interests . . . [but] may consider arguments about public-interest factors only;" and (3) "when a party bound by a forum-selection clause flouts its

27

contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules." Id. at 581–82. "A Court must deem the private-interest factors to weigh entirely in favor of the preselected forum." Id. at 582. The Supreme Court recognized in Atlantic Marine that it is conceivable that a court could refuse to transfer a case notwithstanding a forum-selection clause, but "such cases will not be common." Id. at 582. That is, "in all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain," meaning enforcing the forum-selection provision. Id. at 583.

One possible reason for refusing to enforce the forum-selection provision may be to avoid piecemeal and duplicative litigation and to allow parties a single federal forum in which to litigate their disputes, rather than having parallel cases in different federal courts or competing cases in different jurisdictions litigating the same core dispute. Relatedly, a valid argument for "hardship" under Official Comment 4 to UCC section 2-207 might be the inability to unite all claims in one court or depriving a party of some forum—be it federal, state, or arbitral—to adjudicate legitimate claims. Here, however, there are two potential avenues for the parties to litigate their claim in one court. First, this Court could dismiss Quality Wood's complaint against Ex-Factory,[12] and assuming Quality Wood chooses to continue against Lasercare in the District of South Dakota, then Lasercare could file a third-party complaint against Ex-Factory, bringing all three parties in front of this Court. Second and alternatively, Quality Would could consent to have the entire case transferred to the Western District of North Carolina, then that court

---

[12]This Court is mindful that the Supreme Court in Atlantic Marine preferred transfer under the doctrine of forum non conveniens to dismissal when there is a valid venue-selection provision. However, in this case, there is no issue of the running of the statute of limitations and jurisdiction in this Court plainly exists over claims against co-defendant Lasercare. Thus, dismissal of the Complaint as to Ex-Factory is a proper alternative to attempting to sever the claims in the Complaint against Ex-Factory and transfer of only those claims.

presumably would have jurisdiction over all the parties and claims. Therefore, this does not seem to be "the most unusual [of] cases" under which this Court should decline to enforce the forum-selection terms that Ex-Factory has with Quality Wood. See Atl. Marine, 134 S.Ct. at 583. Nor is this a situation where Lasercare, or any party for that matter, experiences a "hardship" that would justify deeming the forum-selection clauses not to be incorporated under UCC section 2-207(2). Because Lasercare still has a means to assert claims for contribution and indemnity against Ex-Factory regardless of how Quality Wood chooses to proceed, Lasercare's argument about "hardship" under Official Comment 4 to UCC section 2-207(2) fails.

## III.   Order

For the reasons explained above, it is hereby

ORDERED, ADJUDGED, AND DECREED that Ex-Factory's Motion to Dismiss Plaintiff's Complaint, Doc. 6, is granted in part. This Court will transfer the entire case to the United States District Court for the Western District of North Carolina if Quality Wood files a motion for transfer within the next 21 days. Alternatively, if Quality Wood does not want transfer of the entire case, Quality Wood must file a document within the next 21 days so advising this Court, in which case Quality Wood's Complaint as against Ex-Factory then will be dismissed without prejudice while preserving the claims that Quality Wood makes against Lasercare. It is further

ORDERED that Ex-Factory's Motion to Dismiss Lasercare's Cross-Claim, Doc. 32, is granted in part and denied in part. If Quality Wood opts to have the entire case transferred to the United States District Court for the Western District of North Carolina, the Motion to Dismiss Lasercare's Cross-Claim will be denied. If Quality Wood chooses to proceed with its claims against Lasercare here in the United States District Court for the District of South Dakota, then

29

Ex-Factory will be dismissed from the case as a defendant and a cross-claim against Ex-Factory, accordingly is inappropriate. However, Lasercare will be granted leave to file a third-party complaint under Rule 14 of the Federal Rules of Civil Procedure seeking contribution and indemnity from Ex-Factory.

Dated August 20ᵗʰ, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

30